IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THE MOSES H. CONE MEMORIAL           )
HOSPITAL OPERATING CORPORATION,      )
                                     )
            Plaintiff,               )
                                     )
     v.                              )          1:20CV441
                                     )
SOLSTAS LAB PARTNERS GROUP,          )
LLC,                                 )
                                     )
            Defendant.               )          **FILED UNDER SEAL**

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

     Plaintiff The Moses H. Cone Memorial Hospital Operating
Corporation ("Cone") has filed for preliminary injunctive relief
in its declaratory action. (Doc. 2.) Cone sues to enjoin
arbitration initiated by Defendant Solstas Lab Partners Group,
LLC ("Solstas"). (Id.)

## I.   BACKGROUND

     This case arises out of two separate contract disputes
between the parties, one arising out of the 2015 Transition and
Asset Purchase Agreement (the "Transition Agreement"), and one
arising out of the 2005 Laboratory Operations Agreement (the
"Operations Agreement") and the two amendments to the Operations

Agreement.[1] (Complaint ("Compl.") (Doc. 1) ¶¶ 1, 16, 22.) In
2008, the parties amended the Operations Agreement to extend the
term of the agreement, (Declaration of Jodi S. Knox ("Knox
Decl."), Ex. B, Amendment to Laboratory Operations Agreement
("2008 Amendment") Doc. 4-2 § 1(a)); and in 2009, the parties
amended the Operations Agreement again to include Plaintiff's
Willard Dairy Road facility. (Compl. (Doc. 1) ¶¶ 19-20; <u>see also</u>
Knox Decl., Ex. C, Amendment to Laboratory Operations Agreement
and the Hospital Laboratory Reference Agreement ("2009
Amendment") Doc. 4-3 at 2.)

The Operations Agreement contains the following provisions
concerning conflict resolution:

17. **Governing Law.**

This Agreement and the transactions contemplated
hereby shall be construed and enforced in accordance
with the laws of North Carolina without regard to the
conflict of law provisions thereof. Jurisdiction and
venue for litigation of any dispute, controversy or
claim arising out of or in connection with this
Agreement shall be only in a United States federal
court or a state court having subject matter
jurisdiction located in North Carolina. Each of the
parties hereby expressly submits to the personal
jurisdiction of the foregoing courts located in North
Carolina, and waives any objection or defense based on

---

[1] Defendant was not the original party to the Operations
Agreement. It was originally a company called Spectrum, which
was sold several times to different private equity firms until
Quest Diagnostics bought it in 2014 and renamed it Solstas.
(Complaint (Doc. 1) ¶ 21.)

- 2 -

personal jurisdiction or venue that might otherwise be
asserted to proceedings in such courts.

.  .  .  .

22.  **Dispute Resolution.**

Disputes under this Agreement shall be
exclusively decided in accordance with the mediation
rules of the American Health Lawyers Association
("AHLA") with the proceedings to be conducted in
Winston-Salem, North Carolina. If mediation does not
produce a resolution of the dispute within 120 days
after the initiation thereof, then such dispute shall
be exclusively decided in accordance with the
arbitration rules of AHLA, with the proceedings to be
conducted in Winston-Salem, North Carolina.

(Knox Decl., Ex. A, Laboratory Operations Agreement ("Operations

Agreement") (Doc. 4-1) §§ 17, 22.)

The Operations Agreement also contains the following

provisions concerning the termination transition:

The parties agree to cooperate with each other during
the transition to effect a reasonable and orderly
transition. The parties shall . . . develop a specific
and detailed plan for the transition, reasonably
calculated to implement, efficiently and effectively,
the transition of Services back to Hospital or to
another provider.

(Id. § 7(c)(3).)

The Transition Agreement contains a choice of law clause

stating:

13.  **Governing Law**. This Agreement shall be
governed by and interpreted in accordance with the
laws of the State of North Carolina; provided,
however, that any North Carolina law concerning
conflicts of laws that would cause this Agreement to

- 3 -

be subject to the laws of any other state shall not be applicable to this Agreement.

(Transition and Asset Purchase Agreement Between The Moses H. Cone Memorial Hospital Operating Corporation and Solstas Lab Partners Group, LLC ("Transition Agreement") (Doc. 10) § 13.) The Transition Agreement contains neither an arbitration agreement nor a forum selection clause. The Transition Agreement also contains the following provisions:

> C.   Cone Health has provided notice of nonrenewal of the Operations Agreement to Solstas pursuant to Section 7(a) of the Operations Agreement . . .
>
> . . . .
>
> G.   The parties desire to enter into this Agreement to set forth the terms upon which the parties shall terminate the Operations Agreement and resolve certain other matters among them.
>
> . . . .
>
> 19.   <u>Entire Agreement</u>. This Agreement . . . shall constitute the entire agreement between the parties with respect to the matters contained in this Agreement, and any other agreement between the parties, oral or written, with respect to such matters is superseded except for the provisions of the Operations Agreement which remain in effect in accordance with its terms.

(<u>Id.</u> §§ C, G, 19.)

The 2008 and 2009 Amendments (together, "the Amendments") contain identical forum selection clauses:

- 4 -

> This Amendment shall be construed and enforced in
> accordance with the laws of North Carolina without
> regard to the conflict of law provisions thereof.
> Jurisdiction and venue for litigation of any dispute,
> controversy or claim arising out of or in connection
> with this Amendment shall be only in a United States
> federal court or a state court having subject matter
> jurisdiction located in North Carolina. Each of the
> parties hereby expressly submits to the personal
> jurisdiction of the foregoing courts located in North
> Carolina, and waives any objection or defense based on
> personal jurisdiction or venue that might otherwise be
> asserted to proceedings in such courts.

(2008 Amendment (Doc. 4-2) § 8(C); 2009 Amendment (Doc. 4-3) § 4(C).) The Amendments do not contain an arbitration clause. The Amendments also provide that "[e]xcept as otherwise amended herein, all other terms and provisions of the [Operations] Agreement shall remain in full force and effect." (2008 Amendment (Doc. 4-2) § 7; 2009 Amendment (Doc. 4-3) § 3.)

In 2015, Plaintiff notified Defendant that it was not renewing the Operations Agreement, and thus the Operations Agreement would terminate, effective December 22, 2015. (Compl. (Doc. 1) ¶ 22; see also Transition Agreement (Doc. 10) § C.) The parties entered into the Transition Agreement in order to resolve a dispute over money Plaintiff allegedly owed Defendant, as well as to "set forth the terms upon which the parties shall terminate the Operations Agreement." (Id.; Transition Agreement (Doc. 10) § G.) Under the Transition Agreement, the parties agreed that an auditor would conduct an audit and identify what

- 5 -

amount, if any, Plaintiff owed Defendant. (Compl. (Doc. 1) ¶ 23; Transition Agreement (Doc. 10) § 5.) The auditor found that Plaintiff owed Defendant $288,460.00, and ordered Plaintiff to pay Defendant, which Plaintiff refused to do. (Compl. (Doc. 1) ¶ 24.) Plaintiff instead offered Defendant a reduced amount. (Id.)

"Around the same time," Defendant also inquired about money Plaintiff owed under the Operations Agreement, which involved services rendered at the Willard Dairy Road facility, thus implicating the 2009 Amendment. (Id. ¶ 26.) Plaintiff disputed owing this money as well. (Id.)

As a result of Plaintiff disputing the amounts it owed to Defendant, Defendant filed its Statement of Claim with the American Health Lawyers' Association ("AHLA") in April 2019, asserting a breach of the Operations Agreement and a breach of the Transition Agreement. (Id. ¶ 33.)

Defendant also filed a motion to compel arbitration, as well as a claim for breach of contract for the Transition Agreement, in November 2019 in this court under a separate case number. (See 1:19CV409, Doc. 16.) Plaintiff opposed the motion, contending there was no agreement to arbitrate under the Transition Agreement. (See id., Doc. 28.) After briefing closed on the motion to compel arbitration, Defendant asked the

- 6 -

arbitrator to determine whether "its claims were subject to arbitration, should the Court determine an agreement to arbitrate exist[]." (Compl. ¶ 5; Declaration of Philip J. Mohr, Ex. G (Doc. 5-2) at 3; Declaration of Craig D. Schauer, Ex. B. (Doc. 19-2) at 2.)

The arbitrator issued a preliminary award regarding arbitrability. (Doc. 5-2.) The arbitrator acknowledged the action pending in the Federal District Court for the Middle District of North Carolina but made his own ruling of arbitrability. (Id. at 2–3, 8–11.) The arbitrator found that the Operations Agreement was terminating by expiration of its maximum life span of ten years on December 23, 2015. (Id. at 6.)

Plaintiff filed its Complaint and its preliminary injunction motion in this court. (Docs. 1, 2.) Plaintiff requests the court either preliminarily enjoin or stay the arbitration or enjoin Defendant from continuing to prosecute its arbitration until the court issues a judgment on Plaintiff's Complaint. (Doc. 2 at 1; Doc. 3 at 25.)

## II.  **ANALYSIS**

Plaintiffs have moved for a preliminary injunction. (See Doc. 2.) "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary

- 7 -

relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008). Such an injunction "is an extraordinary remedy intended to protect the status quo and prevent irreparable harm during the pendency of a lawsuit." <u>Di Biase v. SPX Corp.</u>, 872 F.3d 224, 230 (4th Cir. 2017). To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a certainty of success, but must make a clear showing that he is likely to succeed at trial." <u>Id.</u> Accordingly, the court first must determine whether Plaintiff is likely to succeed on the merits.

### A. <u>Likelihood of Success</u>

As the Supreme Court has observed, it is the rare and special case where the evidence is so overwhelming in one direction that a temporary injunction may issue. <u>See Mazurek v. Armstrong</u>, 520 U.S. 968, 972 (1997) (describing a preliminary injunction as "an extraordinary and drastic remedy, one that should not be granted unless the movant, <u>by a clear showing</u>, carries the burden of persuasion") (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 2948 (2d ed. 1995)).

Plaintiff alleges in its Complaint that both disputes involving Solstas arise out of the Operations Agreement and the

- 8 -

Transition Agreement. Plaintiff disputes the existence of an agreement to arbitrate in the Operations Agreement and the Transition Agreement. (Doc. 3 at 17, 20.) Plaintiff's arguments includes both the fact that the existence of the forum selection clause, stating litigation shall occur in the federal or state courts of North Carolina, demonstrates that there was no "meeting of the minds concerning an agreement to arbitrate," regarding the Operations Agreement, and that the Operations Agreement was never incorporated into the Transition Agreement, which does not contain an arbitration agreement of its own. (Id. at 18, 20.)

Defendant contends that the Transition Agreement is "an appendage to the Operations Agreement" due to the provision in the Operations Agreement providing for a "specific and detailed plan for the transition" upon termination, and Section G in the Transition Agreement which states that the parties enter into the Transition Agreement to "set forth the terms upon which the parties shall terminate the Operations Agreement." (Doc. 18 at 22.) Therefore, Defendant argues, because the Transition Agreement is an extension of the Operations Agreement, and the Transition Agreement expressly states that "the provisions of the Operations Agreement . . . will remain in effect in accordance with its terms," the parties must arbitrate their

- 9 -

dispute arising out of the Transition Agreement, in accordance
with the "provisions of the Operations Agreement." (<u>Id.</u>)

The issue before the court is whether Plaintiff is likely
to succeed on the merits in its challenge to the existence of an
agreement to arbitrate. Because the Operations Agreement, the
Amendments, and the Transition Agreement contain different
provisions, the court will examine each separately. The court
will start with the Operations Agreement, given whether there is
an agreement to arbitrate the Transition Agreement is dependent
upon the existence of an agreement to arbitrate in the
Operations Agreement.

### 1. **Operations Agreement**

Here, the court finds that Plaintiff fails to make a clear
showing that it is likely to succeed regarding an agreement to
arbitrate the Operations Agreement.

The Operations Agreement's arbitration clause is broad:

22. **Dispute Resolution.**

> Disputes under this Agreement shall be
> exclusively decided in accordance with the mediation
> rules of the American Health Lawyers Association
> ("AHLA") with the proceedings to be conducted in
> Winston-Salem, North Carolina. If mediation does not
> produce a resolution of the dispute within 120 days
> after the initiation thereof, then such dispute shall
> be exclusively decided in accordance with the
> arbitration rules of AHLA, with the proceedings to be
> conducted in Winston-Salem, North Carolina.

(Operations Agreement (Doc. 4-1) § 22.)

The Operations Agreement also contains a forum selection clause dictating that litigation shall only be in the federal or state courts of North Carolina. The court must determine whether the forum selection clause negates the parties' arbitration provision such that there was no "meeting of the minds."

It is well-settled that a "party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Levin v. Alms & Assocs., Inc., 634 F.3d 260, 266 (4th Cir. 2011).

When the parties dispute whether an obligation to arbitrate exists, "the presumption in favor of arbitration does not apply." Noohi v. Toll Bros., Inc., 708 F.3d 599, 611 n.6 (4th Cir. 2013) (citing Granite Rock Co. v. Int'l Bhd. of Teamsters, 561 U.S. 287, 298 (2010)). And in the face of silence or ambiguity, the presumption is that the court and not the arbitrator will decide arbitrability, Rock-Tenn Co. v. United Paperworkers Int'l Union, AFL-CIO, 184 F.3d 330, 335 (4th Cir. 1999) (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944-45 (1995)).

Whether a valid, enforceable arbitration agreement exists "is a matter of contract interpretation governed by state law." Rota-McLarty v. Santander Consumer USA, Inc., 700 F.3d 690, 699 (4th Cir. 2012); see also Adkins v. Labor Ready, Inc., 303 F.3d

- 11 -

496, 501 (4th Cir. 2002) ("Whether a party agreed to arbitrate . . . is a question of state law governing contract formation.").

Under North Carolina law, "[a] contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law," but when "[w]hen an agreement is ambiguous and the intention of the parties is unclear, . . . interpretation of the contract is for the jury."[2] Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., 362 N.C. 269, 273, 658 S.E.2d 918, 921 (2008) "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." Id. (quoting Register v. White, 358 N.C. 691, 695, 599 S.E.2d 549, 553 (2004)).

The court must interpret a contract such that "each and every part of the contract must be given effect if this can be done by any fair or reasonable interpretation; and it is only after subjecting the instrument to this controlling principle of construction that a subsequent clause may be rejected as

_____

[2] "To decide whether 'sufficient facts' support a party's denial of an agreement to arbitrate, the district court is obliged to employ a standard such as the summary judgment test." Rowland v. Minn. Life Ins. Co., Civil Action No. 5:19-CV-00069-KDB-DCK, 2020 WL 534499, at *8 (W.D.N.C. Feb. 3, 2020) (quoting Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc., 807 F.3d 553, 564 (4th Cir. 2015)); see also Fed. R. Civ. P. 56(a).

repugnant and irreconcilable." <u>Davis v. Frazier</u>, 150 N.C. 447, 451, 64 S.E. 200, 201-02 (1909); <u>see also</u> <u>Internet East, Inc. v. Duro Commc'ns, Inc.</u>, 146 N.C. App. 401, 406, 553 S.E.2d 84, 87 (2001) (applying this principle to conflicting arbitration and forum selection clauses).

The court reads the forum selection in harmony with the arbitration clause: the parties agree to mediate and arbitrate all disputes but if litigation is necessary before or after mediation and arbitration for issues arising out of the Operations Agreement, such as whether an arbitration agreement exists or enforcement of an arbitration award, then the litigation shall take place in a federal or state court in North Carolina. "In the present case, the arbitration provision and the forum selection clause may be given effect without conflict." <u>Internet East</u>, 146 N.C. App. at 406, 553 S.E.2d at 87.

The court finds that Cone's reliance on <u>Greerwalker, LLP v. Jackson</u>, Civil Action No. 3:16-CV-235, 2016 WL 3770954 (W.D.N.C. July 14, 2016); <u>Gay v. Saber Healthcare Grp., L.L.C.</u>, ___ S.E.2d ___, 2020 WL 1918812 (N.C. App. Apr. 21, 2020); and <u>Johnston County v. R.N. Rouse & Co.</u>, 331 N.C. 88, 414 S.E.2d 30 (1992), and its characterizations of those cases, unpersuasive.

- 13 -

While Plaintiff compares the present facts to those in Greerwalker, the situations and attendant legal issues are distinguishable. There, the issue of whether there was an arbitration agreement stemmed from the fact that the plaintiff in that case had signed an engagement letter containing an arbitration agreement with a corporation, but the defendants in the case who were attempting to engage the plaintiff in arbitration were not signatories to that letter but instead were merely shareholders of the corporate signatory. Greerwalker, 2016 WL 3770954, at *1. The district court found that, because the defendants were not parties to the engagement letter nor had the defendants offered evidence of communications between them and the plaintiff tending to show any sort of agreement regarding arbitration, there was no "'clear and unmistakable' indication that Plaintiff and Defendants agreed that questions of arbitrability would be decided by the arbitrator." Id. at *2. This is not the case here. Plaintiff and Defendant agreed to the Operations Agreement which contains an explicit arbitration agreement. There is no dispute that Plaintiff and Defendant are both parties to that agreement. The dispute is instead whether the forum selection clause and the arbitration agreement are reconcilable.

- 14 -

The court also distinguishes this case from the facts in
Gay. The facts in Gay involved a contract signed by the
plaintiff upon admission of her mother into an assisted living
facility. The contract at issue contained an arbitration
provision, which included a clause stating that the parties were
"giving up their constitutional right to have any claim decided
in a court of law before a judge and a jury," as well as a
provision stating the parties agree to waive the right to a jury
trial but expressly reserve the right to a bench trial. Gay,
2020 WL 1918812, at *2, *4. Further, the defendants failed to
show or provide the arbitration agreement to the plaintiff at
the time of contracting. Id. at *3–4. The North Carolina Court
of Appeals held that the arbitration clause and the clause
preserving the right to a bench trial could not be read in
harmony, given the arbitration clause "expressly foreclos[ed]" a
bench trial. Id. at *5. In contrast, the arbitration clause here
does not expressly foreclose litigation in the courts; instead,
it dictates that disputes shall be arbitrated but contains no
language "expressly foreclos[ing]" litigation in the courts. The
court thus finds that Gay does not control here.

Finally, Rouse dealt with an arbitration agreement and what
the court defined as a "consent to jurisdiction provision,"
which stated that "[b]y executing a contract for the Project the

- 15 -

Contractor agrees to submit itself to the jurisdiction of the courts of the State of North Carolina for all matters arising or to arise hereunder . . . ." Rouse, 331 N.C. at 90, 414 S.E.2d at 31-32. The court distinguished between "forum selection clauses," which provide that a particular state's substantive laws will govern the contract, "consent to jurisdiction clauses," which authorizes the courts of the chosen jurisdiction to exercise personal jurisdiction over the parties, and "forum selection provision[s]," which "designates a particular state or court as the jurisdiction in which the parties will litigate disputes arising out of the contract and their contractual relationship." Id. at 93, 331 N.C. at 33. Importantly, however, as the Internet East court noted,

> the Rouse Court never specifically stated how it would have ruled if the provision had been a true forum selection clause. The Court simply was not faced with that issue and therefore did not rule on it. Moreover, even if such an inference could be drawn from Rouse, the issue in the principal case would not necessarily be answered since the proper resolution of this case depends on the particular language used by the parties in their contract, and the location in the contract of the two provisions at issue.

Internet East, 146 N.C. App. at 408, 553 S.E.2d at 88-89. This court agrees and finds that Rouse also does not control.

The court finds that the present facts are more comparable to Internet East. Here, the "particular language used by the

- 16 -

parties in their contract[s]," — "disputes" versus "litigation," along with no explicit waivers of the parties' rights to jury or bench trials, indicates that these two provisions were meant to be read in harmony.

Further, "the location in the contract of the two provisions" also supports the court's finding. The provisions are in normal sized font, four subsections away from each other with one page in between them. Plaintiff attempts to argue that, because the provisions are "on different pages," the facts are distinguishable from the contract in Internet East, where the court found the location of the forum selection clause and the arbitration provision — "both located on the same page and within the same Article" — was material in finding the arbitration provision enforceable. "Intent is derived not from a particular contractual term but from the contract as a whole." State v. Philip Morris USA Inc., 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005). Arguing that two clauses covering similar subject matters could not be read in harmony merely because they are on "different pages" belies this foundational contract interpretation principle. This argument is without merit.

For the purposes of this preliminary injunction order, the court finds that the Operations Agreement is unambiguous and that the forum selection clause and the arbitration agreement do

- 17 -

not conflict under a reasonable interpretation of the contract and therefore the parties agreed to arbitrate.

### 2. <u>The 2008 and 2009 Amendments</u>

The court now turns to whether the 2008 and 2009 Amendments fall outside the Operation Agreement's arbitration provision.

> When a second contract involves the same subject matter as the first contract, and no rescission has occurred, the contracts must be construed together in identifying the intent of the parties and in ascertaining what provisions of the first contract remain enforceable, and in such construction, the law pertaining to interpretation of a single contract applies.

6 N.C. Index 4th Contracts § 65; <u>see also</u> <u>Beau Rivage Plantation, Inc. v. Melex USA, Inc.</u>, 112 N.C. App. 446, 451, 436 S.E.2d 152, 154 (1993) ("When a second contract involves the same subject matter as the first contract, and no rescission has occurred, the contracts must be construed together."); <u>see also</u> <u>Commercial Nat'l Bank of Charlotte v. Charlotte Supply Co.</u>, 226 N.C. 416, 426, 38 S.E.2d 503, 510 (1946) ("If upon comparison it should be found that rescission has not been effected, the two instruments must be read and construed together in ascertaining the intent of the parties and in determining what portions of the agreement are still enforceable. In such construction the rules applied to interpretation of a single contract are applicable, perhaps with added propriety.").

- 18 -

> To have the effect of rescission, it must either deal
> with the subject matter of the former contract so
> comprehensively as to be complete within itself and to
> raise the legal inference of substitution, or it must
> present such inconsistencies with the first contract
> that the two cannot in any substantial respect stand
> together.

Commercial Nat'l Bank of Charlotte, 226 N.C. at 426, 38 S.E.2d
at 509–10.

The court notes that the 2008 and 2009 Amendments both
provide that "[e]xcept as otherwise amended herein, all other
terms and provisions of the [Operations] Agreement shall remain
in full force and effect. . . . The Agreement and this Amendment
constitute the entire agreement between the parties with respect
to the subject matter thereof." (2008 Amendment (Doc. 4-2) §§ 7,
8(A); see also 2009 Amendment (Doc. 4-3) §§ 3, 4(A).) The forum
selection and choice of law clauses in the Amendments do not
deal with the subject matter of conflict resolution "so
comprehensively as to be complete within itself and to raise the
legal inference of substitution," nor do these clauses "present
such inconsistencies with the first contract that the two cannot
in any substantial respect stand together." Commercial Nat'l
Bank of Charlotte, 226 N.C. at 426, 38 S.E.2d at 510.
Accordingly, the court finds that no rescission has occurred,
the Amendments deal with the same subject matter as the
Operations Agreement — conflict resolution — thus the Amendments

- 19 -

and the Operations Agreement must be construed together as several documents creating one agreement.

The court also observes that the forum selection clauses in the Amendments are nearly identical to the Operations Agreement forum selection clause, only substituting the word "Amendment" for "Agreement." (Compare Operations Agreement (Doc. 4-1) § 17, with 2008 Amendment (Doc. 4-2) § 8(C) and 2009 Amendment (Doc. 4-3) § 4(C).) The court fails to see how the forum selection clauses in the Amendments displaces the arbitration agreement in the Operations Agreement, given the Operations Agreement also contains a nearly identical forum selection clause that this court reads in harmony with the arbitration provision, and considering that the Amendments explicitly state that "all other terms and provisions of the [Operations] Agreement shall remain in full force and effect." There is no indication that the forum selection clauses in the Amendments now apply to all "disputes" arising out of the Amendments; the forum selection clauses still only apply to "litigation," leaving in place the "terms and provisions" in the Operations Agreement concerning arbitration. The court finds the Amendments are unambiguous and that the Amendments' forum selection clauses and the Operations Agreement's arbitration agreement do not conflict under a

reasonable interpretation of the contract and therefore the parties agreed to arbitrate under the Amendments.

### 3. <u>The Transition Agreement</u>

Having found that the parties agreed to arbitrate under the Operations Agreement and the Amendments, the court now must determine the intention of the parties regarding the Transition Agreement.

Plaintiff argues that the Transition Agreement never incorporated the terms of the Operations Agreement, because the Transition Agreement never explicitly states that it incorporates "the terms of the Operations Agreement." (Doc. 3 at 20-22; Doc. 23 at 12.)

Defendant argues that the Transition Agreement is the result of what the parties agreed to do originally in the Operations Agreement; that is, "a specific and detailed plan for the transition, reasonably calculated to implement, efficiently and effectively, the transition of Services back to Hospital or to another provider." (Operations Agreement (Doc. 4-1) § 7(c)(3).) The court agrees, observing that the Transition Agreement explicitly states "Cone Health has provided notice of nonrenewal of the Operations Agreement . . . pursuant to Section 7(a) of the Operations Agreement," and that "[t]he parties desire to enter into this [Transition] Agreement to set forth

- 21 -

the terms upon which the parties shall terminate the Operations

Agreement." (Transition Agreement (Doc. 10) §§ C, G.) Further,

the Transition Agreement provides:

> [t]his Agreement . . . shall constitute the entire
> agreement between the parties with respect to the
> matters contained in this Agreement, and any other
> agreement between the parties, oral or written, with
> respect to such matters is superseded except for the
> provisions of the Operations Agreement which remain in
> effect in accordance with its terms.

(Doc. 18 at 22; see Doc. 10 § 19.) Accordingly, the Transition

agreement "involves the same subject matter as the first

contract [the Operations Agreement], and no rescission has

occurred," Beau Rivage Plantation, 112 N.C. App. at 451, 436

S.E.2d at 154, and thus should be construed together with the

Operations Agreement.

The North Carolina Supreme Court seems to have contemplated

this type of situation: "[T]here is little or nothing in the

[second] contract that would lead to the conclusion that the

parties to the new contract intended otherwise than to create an

ad interim arrangement adjusted to the new conditions until

final compliance with the terms of the original contract became

possible." Commercial Nat'l Bank of Charlotte, 226 N.C. at 432,

38 S.E.2d at 513. The court finds that the Transition Agreement

is "interim" in nature; it is an arrangement to close out the

Operations Agreement. As such, the parties' dispute regarding

- 22 -

the Transition Agreement "arises out" of the Operations Agreement and is therefore subject to its arbitration agreement and forum selection and choice of law clauses.

Construing the Operations Agreement together with the Transition Agreement, the terms of the overall agreement concerning conflict resolution are unambiguous: disputes shall be arbitrated and any litigation shall be conducted in the federal or state courts in North Carolina. The court finds that the parties' agreement to arbitrate under the Transition Agreement and the Operations Agreement is unambiguous.

### 4. <u>Likelihood of Success on the Merits Conclusion</u>

Construing these four contracts together, the court finds that the parties unambiguously contracted to arbitrate disputes "arising under" the Operations Agreement; any litigation concerning other issues, such as the construction of the arbitration agreement, the enforcement of the arbitration agreement, or disputes not "arising under" the Operations Agreement would have to be brought in accordance with the choice of law and forum selection clauses as occurred in this case. The court therefore finds that Cone has not met its burden of demonstrating its likelihood of success on the merits. As the Supreme Court has observed, it is the rare and special case where the evidence is so overwhelming in one direction that a

- 23 -

temporary injunction may issue. See Mazurek, 520 U.S. at 972
(describing a preliminary injunction as "an extraordinary and
drastic remedy, one that should not be granted unless the
movant, by a clear showing, carries the burden of persuasion")
(quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay
Kane, Federal Practice and Procedure § 2948 (2d ed. 1995)). This
factor weighs against preliminary relief.

### B. Irreparable Harm

In addition to a likelihood of success on the merits, a
plaintiff must also make a "clear showing that it is likely to
be irreparably harmed absent preliminary relief" in order to
obtain a preliminary injunction. UBS Fin. Servs. Inc. v.
Carilion Clinic, 880 F. Supp. 2d 724, 733 (E.D. Va. 2012)
(quoting Real Truth About Obama, Inc. v. Fed. Election Comm'n,
575 F.3d 342, 347 (4th Cir. 2009)).

Forcing a party to defend an arbitration complaint when it
never agreed to do so constitutes irreparable harm per se. See
Morgan Keegan & Co. v. Louise Silverman Trust, Civil No. JFM-11-
2533, 2012 WL 113400, at *5 (D. Md. Jan. 12, 2012). But the
court has found that "any harm suffered by [Plaintiff] is a
result of [its] obligations under" the arbitration rules. UBS
Fin. Servs. 880 F. Supp. 2d at 733. "The [Plaintiff] cannot make
a clear showing that [it is] likely to be irreparably harmed

- 24 -

absent preliminary relief." Id. This factor weighs against granting preliminary relief.

C. **Balance of Equities**

The third factor in determining whether preliminary relief is appropriate is whether the plaintiff demonstrates "that the balance of equities tips in his favor." Winter, 555 U.S. at 20. While Plaintiff would incur the costs of participating in the arbitration, a preliminary injunction would deny Defendant's "right to a speedy and less expensive forum to adjudicate its underlying dispute with [Plaintiff]." UBS Fin. Servs. 880 F. Supp. 2d at 734. "Because arbitration is a 'highly favored mechanism for dispute resolution,' equity favors permitting [Defendant]'s arbitration to proceed." Id. Plaintiff therefore fails to demonstrate that the balance of equities tips in its favor. This factor also weighs against preliminary relief.

D. **Public Interest**

Finally, the court must determine whether public policy weighs in favor of granting preliminary relief. Federal public policy favors arbitration. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). "But, it is equally well-established that the policy favoring arbitration has limits; a party cannot be compelled to arbitrate a dispute it did not agree to submit to arbitration." UBS Fin. Servs., 880

- 25 -

F. Supp. 2d at 734 (citing Volt Info. Sci., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ., 489 U.S. 468, 478 (1989); AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986)). Nevertheless, "public policy favors giving effect to the parties' intent." UBS Fin. Servs., 880 F. Supp. 2d at 734. Here, the court has found that the parties agreed to arbitrate in the Operations Agreement; thus, "public policy favors giving effect to the parties' intent by allowing arbitration to proceed." Id. This factor too weighs against preliminary relief.

III. **CONCLUSION**

For the foregoing reasons, the court finds that Plaintiff's motion to enjoin arbitration should be denied.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Preliminary Injunction, (Doc. 2), is **DENIED**.

**IT IS FURTHER ORDERED** that this Memorandum Opinion and Order is **FILED UNDER SEAL** and the parties shall file, within twenty (20) days of the filing of this Opinion, a joint report identifying the information in the Opinion, if any, they contend should be redacted, along with an explanation of the basis for their proposed redactions and a draft of this Opinion with those proposed redactions. Because information contained herein will likely be considered confidential information by the parties,

- 26 -

this Opinion shall remain sealed until the parties have had an opportunity to submit their requested redactions.

This the 29th day of June, 2020.

_____
United States District Judge